#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE DISTRICT OF NEW MEXICO

**ESPANOLA MERCANTILE**
**COMPANY, INC.,**

    **Plaintiff/Counter-Defendant,**

**vs.**                                                                                         **Civ. No. 07-1294 RLP/RHS**

**NORTH WIND, INC.,**

    **Defendant/Counter-Plaintiff.**

#### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Espanola Mercantile Company, Inc., brings suit against Defendant North Wind Inc. Plaintiff seeks recovery on a construction subcontract claiming money due and for *quantum meruit.* Defendant counter-sues, alleging breach of contract. This matter was tried to the Court on the facts without a jury on February 24, 25 and 26, 2009. The Court, having considered the testimony presented at trial, the exhibits admitted into evidence, the arguments of counsel, the pertinent legal authority and the record as a whole, enters the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a)(1) of the Federal Rules of Civil Procedure.

#### FINDINGS OF FACT

1. Plaintiff/Counter-Defendant, Española Mercantile Company, Inc., [EMC herein] is a New Mexico corporation with its principal place of business in Española, New Mexico.

2. EMC does business under the names of Española Transit Mix ["Transit Mix" herein], Rico Paving and Associated Asphalt.

3. EMC, through its affiliates, has been in the paving business for over 30 years.

4. Defendant/Counter-Plaintiff North Wind Inc. [North Wind herein] is an Alaska corporation with its principal place of business in Idaho.

5. In December 2005, the United States of America, acting through the U.S. Department of Energy, entered into a written agreement, No. DE-AC52-06NA27396 with North Wind as the general contractor for the construction of the Los Alamos Airport Landfill and Matcon™ Cap in Los Alamos, New Mexico.

6. North Wind was required to complete the Los Alamos Airport Landfill and Matcon™ Cap project by March 2007.

7. MatCon™ is a proprietary binder formulated to make asphalt impermeable and suitable as a cap over the landfill.

8. On October 4, 2006, North Wind entered into a subcontract with Transit Mix, whereby Transit Mix agreed to perform a test strip at its plant; mobilize to site, provide and load asphalt mixed with the Matcon™ binder, ( binder to be provided by Wilder Construction) and place asphalt pavement containing Matcon™ binder onto the main landfill area.

9. The subcontract was prepared by North Wind.

10. Neither North Wind nor Transit Mix had prior experience with MatCon™ binder.

11. MatCon™ binder makes asphalt more difficult to work with due to its stickiness.

12. The subcontract provided in part that:

   (a) Transit Mix was responsible for providing all equipment necessary to fulfill the requirements of the subcontract. (Subcontract ¶ 2.1).

   (b) The Matcon™ Guide Specifications were incorporated into and made part of the subcontract. (Subcontract ¶ 3).

   (c) Transit Mix would be paid $46.00 per ton of asphalt produced at the plant, and $16.00 per ton of asphalt placed at the job site. (Subcontract, ¶6).

   (d) Transit Mix would start the lay down paving work on October 18, 2006, with

demobilization on October 27, 2006. (Subcontract ¶7).

(e) Transit Mix was responsible for the unloading, storage and protection of all materials at the site, and would bear the risk of loss thereof. (Subcontract General Provisions ¶ I).

(f) Transit Mix was responsible for promptly removing all waste and debris produced by its operation. (Subcontract General Provisions ¶ O).

13. Transit Mix made an offer to haul asphalt to the job site, which would have utilized belly dump trucks at the rate of $100.00 per hour. This offer was not accepted by North Wind.

14. Wilder Construction Company ("Wilder" herein) provided the Matcon™ binder directly to Transit Mix under a separate subcontract with North Wind.

15. Wilder charged North Wind based upon the amount of Matcon™ binder applied per acre of paving, as follows:

(a) Up to 100 tons per acre: $1,062.00 per ton.

(b) Over 100 tons per acre: $1,225.00 per ton.

16. Tsay Construction LLC provided belly dump trucks for hauling the asphalt mixed with Matcon™ binder from Transit Mix's Santa Fe plant to the work site under a separate subcontract with North Wind.

17. .End dump trucks were preferred for this project because they would have deposited hot asphalt mix directly into a lay down paving machine. However, they were not available from any source in sufficient quantities to meet the production quotas set by North Wind.

18. Transit Mix was aware prior to entering into the subcontract with North Wind that end dump trucks were not available.

19. Transit Mix was aware prior to entering into the subcontract with North Wind that belly

dump trucks would be used.

20. The properties of the asphalt mix containing Matcon™ binder require that it be kept at high temperature prior to placement, between 310° and 360° Fahrenheit.

21. As it cools, asphalt mix containing Matcon™ binder hardens and, if not placed, becomes unusable.

22. Asphalt was produced, mixed with Matcon™ binder and loaded into belly dump trucks at Associated Asphalt's Santa Fe plant. There were no quality control problems in either the production or the loading of the asphalt mix.

23. Paving work at the Airport site started on October 18, 2006, but actual paving was delayed until the afternoon because of a bearing malfunction in the laydown paving machine provided by Transit Mix through Rico Construction.

24. Rico Construction performed the paving work.

25. North Wind relied on the experience of Transit Mix/Rico Paving to determine the appropriate method of accomplishing the asphalt paving project.

26. In the paving technique implemented by Rico Construction, belly dump trucks provided by Tsay laid a windrow of hot asphalt mixed with Matcon™ binder in front of a windrow elevator machine. The windrow elevator then lifted the asphalt and deposited it into a laydown paving machine.

27. This paving technique was slow, but did not result in excessive waste of paving material.

28. The windrow elevator malfunctioned on the morning of October 20, 2006, and completely broke down by 9:15 a.m.

29. The windrow elevator was never repaired, and North Wind had to haul the windrow elevator from the site near the end of the paving project.

30. Neither Transit Mix nor Rico Construction provided or attempted to provide a replacement windrow elevator.

31. North Wind representatives Steven Edwards and Kevin Metier met with Rico's on-site supervisor, Joe Ortiz; Wilder's representative, Jerry Thayer; Jeffrey Rowe; and a materials supplier, Bradley Parker, on October 20, 2006 to attempt to devise a way to work around this equipment malfunction.

32. It was necessary to find an immediate solution, in order not to waste the asphalt mixed with Matcon™ binder that was in production and being transported to the site.

33. Bradley Parker suggested "tramming" the materials; that is, having the asphalt mixed with Matcon™ binder dumped on the ground by the belly dump trucks, scooped up by a front end loader and placed into an end dump truck, which then placed the asphalt directly into the laydown paving machine.

34. The "tramming" method of delivering asphalt mixed with Matcon™ binder was implemented on October 20, 2006 and utilized throughout the remainder of the paving project.

35. The "tramming" method was necessitated solely because of the break down of the windrow elevator.

36. The "tramming" method resulted in excessive waste due to:
    (a) the cooling of the asphalt caused by additional handling;
    (b) the compaction caused by heavy equipment rolling up to and upon the asphalt pile; and
    (c) the inability to scrape to the bottom of the pile due to hardening and the need to prevent contamination with the base course.

37. The excessive waste produced by the "tramming" method included quantities of Matcon™ binder which North Wind separately paid Wilder to furnish.

38. Representatives of Transit Mix were unconcerned about the amount of waste generated by the "tramming" method because Transit Mix was paid for the asphalt as it left the plant.

39. North Wind's on-site project supervisor, Chris Richardson, was aware of the excessive waste produced by the "tramming" method, but believed Transit Mix was responsible for the costs incurred due to excessive waste.

40. North Wind's Division Manager, Kevin Redmond, was not told of the excessive waste by his on-site project supervisor, Chris Richardson, until the "end of the week."

41. Representatives of North Wind and Transit Mix never discussed who would be responsible for costs incurred due to excessive waste.

42. North Wind utilized its equipment, labor and materials to moved hot asphalt mixed with Matcon™ binder from where it was dumped by the belly dump trucks to the lay down paving machine.

43. North Wind utilized its equipment, labor and materials to removed wasted asphalt from the site on a daily basis, and eventually to remove all wasted asphalt to a landfill.

44. The weather did not necessitate the use of more Matcon™ in the asphalt mix.

45. It is expected in the paving industry that a certain amount of asphalt will be wasted.

46. According to accepted industry practice, the paving contractor is responsible for the costs of excessive waste.

47. A 5%-10% waste calculation is the accepted industry standard for waste in the laying of hot asphalt.

48. An acceptable percentage of asphalt waste on this project is 10%.

49. As built, the Los Alamos Airport Landfill and Matcon™ Cap substantially complied with all project specifications and was warranted by Wilder Construction.

50. Based on project specifications, 5,234 tons of asphalt was required to complete the paving project, prior to calculation of an acceptable percentage of asphalt waste.

51. Transit Mix produced 6,939.6 tons of asphalt mix, which was billed to North Wind at a rate of $46.00 per ton.

52. The "tramming" method utilized by Transit Mix /Rico Construction resulted in 1,182.2 tons of excessive asphalt waste.

53. The "tramming" method utilized by Transit Mix/Rico Construction resulted in 121.75 tons of wasted Matcon™ binder.

54. The cost to North Wind of excessive Matcon™ binder waste was $157,473.50.

55. Transit Mix billed North Wind $319.221.60 for asphalt production (6,939.60 tons x $46.00/ton) .

56. Transit Mix billed North Wind $111,456.80 for asphalt placement (6,966.05 tons x $16/ton).

57. North Wind made payment to Transit Mix in the amount of $238.323.24 for asphalt production. North Wind arrived at this figure by deducting from the Transit Mix invoice, the value of 1,183 tons of wasted asphalt.

58. North Wind made payment to Transit Mix in the amount of $94,055.60 for asphalt placement. North Wind arrived at this figure by deducting from the Transit Mix invoice, the value of 1,183 tons of wasted asphalt.

59. North Wind incurred additional expenses in the amount of $32,667.48 in providing labor, equipment and materials that Transit Mix was contractually obligated to provide but failed to provide.

**CONCLUSIONS OF LAW**

1. The Court has jurisdiction over the parties and the subject matter of this case pursuant to 28 U.S.C. § 1332(c)(1).

2. Venue is properly laid in the District of New Mexico.

3. The substantive law of the State of New Mexico applies.

4. EMC seeks recovery for money due under its contract with North Wind, an express agreement. Therefor, there is no recovery under *quantum meruit*. EMC provided no evidence of an alternative reasonable valuation of its services to support a theory of recovery under *quantum meruit*.

5. EMC does business under the names of Transit Mix, Rico Construction and Associated Asphalt.

6. A contract existed between Transit Mix and North Wind under which Transit Mix, for consideration, agreed to provide hot asphalt mixed with Matcon™ binder and paving services to North Wind in connection with the Los Alamos Airport Landfill and Matcon™ Cap in Las Alamos, New Mexico.

7. Every contract in New Mexico imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract." WXI/Z Southwest Malls v. Mueller, 2005-NMCA-046, ¶ 25, 110 P.3d 1080, 1087. The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." Id. "The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement. Denying a party its rights to those benefits will breach the duty of good faith implicit in the contract." Planning and Design Solutions v. City of

Santa Fe, 118 N.M. 707, 714, 885 P.2d 628, 635 (1994).

8. EMC acting through Transit Mix, Rico Construction and Associated Asphalt, promised to exercise judgment and display the quality of workmanship which is standard in the field of asphalt mixing and laying.

9. EMC, acting through Transit Mix, Rico Construction and Associated Asphalt, failed to exercise judgment which is standard in the field of asphalt mixing and laying.

10. EMC, acting through Transit Mix, Rico Construction and Associated Asphalt, was obligated to exercise that degree of skill which a reasonably prudent person skilled in asphalt mixing and laying would exercise in the circumstances

11. EMC, acting through Transit Mix, Rico Construction and Associated Asphalt, failed to exercise that degree of skill which a reasonably prudent person skilled in asphalt mixing and laying would exercise in the circumstances.

12. EMC's failure to provide an working windrow elevator at the job site was a breach of its subcontract with North Wind.

13. At the time of making the subcontract, EMC could reasonably have expected that breakdown and non-repair/replacement of its windrow elevator would result in  excessive waste of asphalt mixed with Matcon™ binder and, therefore would result in excessive and unreasonable costs to North Wind.

14. EMC's breach of contract renders it liable for money damages in an amount that will compensate North Wind for what it lost as a result of  EMC's breach.

15. Pursuant to the terms of the subcontract, EMC is responsible for the costs of excessive waste of asphalt paving material.

16. The failure of Transit Mix,  Rico Construction and/or Associated Asphalt to exercise

judgment and display the quality of workmanship which is standard in the field of asphalt mixing and laying, and to exercise that degree of skill which a reasonably prudent person skilled in asphalt mixing and laying would exercise in the circumstances, renders EMC liable for excessive waste of asphalt mix under Transit Mix's subcontract with North Wind.

17. The cost of excessive asphalt mix is a proper offset to any amount owed by North Wind to Transit Mix under the subcontract.

18. Transit Mix has been paid all monies it is due by North Wind under the subcontract.

19. As a result of EMC's breach of contract, North Wind is entitled to damages on its Counterclaim as follows:

   (a) For excessive waste of Matcon™ binder: $157,473.50.

   (b) For the costs of North Wind's labor, equipment and materials in connection with asphalt laying and waste removal: $32,667.48.

_____
Hon. RICHARD L. PUGLISI